Clk's copy

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIM A. CAIN and RITA CAIN,
husband and wife, individually
and as Parents and Next Friends
of Angel Marie Cain, a minor,

        Plaintiffs,

v.                                No. CIV 96-166M

RPJ TIRE COMPANY, INC.,
d/b/a PARNELLI JONES, INC.,

        Defendant,

and

USBENEFITS INSURANCE
SERVICES, INC.,

        Garnishee,

and

JOHN ALDEN LIFE INSURANCE CO.,

        Garnishee.



## MEMORANDUM OPINION AND ORDER

      Plaintiffs continue this case in an attempt to collect their judgment. After a bench trial, a senior judge sitting by designation awarded Plaintiffs substantial damages in unpaid medical expenses due them by reason of Defendant's employee benefits plan. Defendant is now a defunct corporation without assets. The named Garnishees are two insurers who hold consecutive

policies issued to Defendant in conjunction with its benefits plan. Plaintiffs have applied for writs of garnishment, attempting to collect from the proceeds of the two insurance policies. Both Garnishees deny any indebtedness to Defendant; and both, as well as Plaintiffs, have filed Motions for Summary Judgment pursuant to Fed. R. Civ. P. 56. In addition, Garnishee John Alden Life Insurance Company has filed a Motion to Strike Exhibits, Garnishee USBenefits Insurance Services, Inc. has filed a Motion to Strike Affidavits, and Plaintiffs have filed for additional attorney's fees. Defendant has taken no position on any post-trial matters. In August, counsel for Defendant was allowed to withdraw and Defendant has not appeared since.

I have reviewed the record, the law and arguments of counsel. I resolve the pending motions in favor of the Plaintiffs and conclude that both insurance policies are subject to garnishment.

Standards Applied

Summary judgment may appropriately be granted where there exists no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law. Thrasher v. B&B Chemical Company, 2 F.3d 995, 996 (10th Cir. 1993). The party moving for summary judgment bears the initial burden of demonstrating there are no genuine issues of material fact and an absence of evidence to support the opposing case. Celotex Corporation v. Catrett, 477 U.S. 317, 325 (1986); Bacchus Industries v. Arvin Industries, Inc., 939 F. 2d 887, 891 (10th Cir. 1991). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986).

Determining the legal operation of a contract and deciding what rights and obligations are

2

contained in an unambiguous written instrument present questions of law. Resolution Trust Corporation v. Mustang Partners, 946 F. 2d 103, 104 (10th Cir. 1991); Nearburg v. Yates Petroleum Corporation, 123 N.M. 526, 531, 943 P.2d 560 (Ct. App. 1997), *cert. denied* 123 N.M. 446, 942 P.2d 189 (1997). Whether a contractual provision is plain and clear or ambiguous is also a question of law. Id.; Southwest Stationery & Bank Supply, Inc. v. Harris Corp., 624 F.2d 168, 170 (10th Cir. 1980).

In New Mexico, it is considered "well-settled" that "the construction of an insurance policy is governed generally by the law of contracts." Jaramillo v. Providence Washington Insurance Company, 117 N.M. 337, 340, 871 P.2d 1343, 1346 (1994). Construction and interpretation of contractual agreements are not the same. 5 Corbin on Contracts, Rev. Ed., sec. 24.3 (1998). When "interpreting" a contract, "a court determines what meanings the parties, when contracting, gave to the language used," but stops short of a determination of the parties' legal relationships. Id. Construction of a contract, on the other hand, begins with interpretation of contract language, and a court determines the contract's legal operation, that is, its effect upon the rights and duties of the parties. Id. An insurance contract is to be construed as a whole, and a court's construction is to be guided by the reasonable expectations of the insured. Rummel v. Lexington Insurance Company, 123 N.M. 752, 758, 945 P.2d 970, 976 (1997).

Underlying Facts

The facts material to the pending motions are not disputed. In 1994, Defendant Parnelli Jones, then doing business as a nationwide automobile tire retailer with approximately 475 employees in seven states, created an employee benefits plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. sec. 1001 *et seq*

3

Plaintiff Jim Cain, an employee in Defendant's New Mexico store at the time, was enrolled in the plan beginning February 10,1994. In setting up its employee benefits plan, Parnelli purchased insurance to cover medical expense claims exceeding $60,000. These policies were payable to Parnelli, which was to be self-insured for the first sixty thousand dollars of any single claim, with the insurance providing reimbursement to Parnelli for amounts paid out in excess of sixty thousand, up to one million dollars.

Plaintiffs characterize the insurance Parnelli purchased as "excess loss" policies. The Garnishees characterize the insurance policies as "excess reimbursement" policies. In either case, the USBenefits policy took effect at the inception of the employee benefit plan (February 1,1994) and expired February 1, 1995. The John Alden coverage took effect beginning February 1,1995, and was to cover medical expense claims incurred in the period from November 1,1994 through January 31, 1996, paid out in the period from February 1,1995 through January 31,1996. Both insurers and Parnelli understood the polices to be components of a ERISA plan and both policies expressly refer to ERISA as a controlling statutory scheme.

While Plaintiff Jim Cain was employed by Parnelli Jones and included within its employee benefits plan, Plaintiff's daughter, Angel Marie, was born prematurely. The child required exceptional care and incurred significant hospital and other medical expenses. From her birth on December 11, 1994, to February 26, 1995, these expenses amounted to $177,636. Even though Plaintiff believed his daughter covered by his health benefits from her date of birth, Parnelli refused to accept Angel Marie as enrolled in its benefits plan and paid none of her medical expenses. Each of the insurance policies intended to cover medical expense claims exceeding sixty thousand dollars was in force at a time concurrent with the medical expenses

4

incurred by Angel Marie, but neither of the two policies was invoked by Parnelli Jones and thus neither made any payment attributable to the child's medical care.

After Plaintiffs were sued for non-payment of the hospital bills, they filed a third-party complaint against Defendant. The case was removed to federal court and the two insurers (at Defendant's insistence) were forced to participate in the litigation by payment of legal fees on an as-incurred basis, and in exchange, Defendant did not name either insurer as a party to the action, even though both were likely to be liable for part of the judgment if Plaintiffs prevailed. After several months, Defendant Parnelli notified the insurers, well before trial, that it was without assets and going out of business. Parnelli then expressed its intention to accept a default judgment. The two insurers, however, concerned that Plaintiffs would attempt to collect a judgment against the insurance polices, decided independently to defend the case on the merits.

After trial, a Memorandum of Decision held that Defendant had wrongfully withheld health benefits to which Plaintiff Jim Cain was entitled. The Decision concluded that Parnelli's refusal to pay for the newborn's medical care constituted a breach of the employee benefit contract and that Parnelli's failure to advise Plaintiff how to enroll his daughter for health benefits constituted a breach of its fiduciary duty. Defendant was held liable for all of Angel Marie's past medical expenses, plus interest. The Memorandum of Decision stated that Angel Marie's enrollment in the Plan was to be effective "as an enrollment within the thirty-one days of her birth . . . ;" and in addition to damages of $277,399, the trial judge awarded Plaintiffs costs of $8,595, attorney's fees of $120,254, and per diem interest of $71.58 per day beginning February 10, 1999.

Not able to collect any of its award from Defendant Parnelli, Plaintiffs seek writs of

5

garnishment pursuant to New Mexico statute. They claim a right to collect from the two insurance policies purchased by Parnelli to cover employee medical expense claims. In response, the two insurers, who are now the Garnishees, deny that Parnelli is entitled to any of the proceeds of the insurance policies and that either is susceptible to garnishment.

## Public Policy

Both Garnishees point to the express terms of the two insurance policies at issue which provide only for reimbursement to Parnelli Jones after Parnelli has paid out more than sixty thousand dollars on a health benefit claim. Parnelli has paid nothing on Plaintiffs' claim and the insurers insist nothing is due pursuant to the terms of the polices. Because garnishment can operate only against what the Garnishees hold of the Defendant's property, the insurers reason that the proceeds of the two policies are beyond reach.

The Garnishees support their position with California law. I have considered federal law and policy and New Mexico law. I have considered the choice of law issue not because I find there is a conflict between California and New Mexico law, but only because the Garnishees assume California law applies, and I disagree. I have also not reviewed the consequences of California law to this case prior to making a choice of law decision because state law in this case has only limited application. While I find, for example, that pursuant to New Mexico law Plaintiffs are third party beneficiaries of the two policies at issue, I also reach the same result by federal law and policy, because by the law of the case, the medical payments which constitute the basis of Plaintiffs' judgment arise from a ERISA plan and I conclude that ERISA expresses a federal policy to protect the interests and expectations of participants and beneficiaries in employee benefit plans.

6

Choice of state law issues exemplify why ERISA policy is central to the present case. ERISA was enacted in part to prevent anomalous variations in receipt of ERISA benefits because of the application of differing state law and also to insure that, once established, a ERISA plan actually provides the benefits promised. 120 Cong. Rec. 29197 (1974). Rather than permit the application of state law to import differing health benefits under the same ERISA plan, or perhaps as in this case, allow unenforced public policy to destroy ERISA benefits altogether, federal law and policy must in the end answer the most fundamental questions.

ERISA represents not only an enforceable federal scheme, but also a broad and discernible policy for the support and preservation of employee benefits. Firestone Tire & Rubber Company v. Bruch, 489 U.S. 101 (1989); 29 U.S.C. sec. 1001. It sets out a public policy that is both "well-defined and dominant." Id.; United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 42 (1987). For these reasons, ERISA remains paramount to the final outcome in the present case. Federal courts "are directed to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by the federal policies at issue." Saltarelli v. Bob Baker Groups Medical Trust, 35 F.3d 382, 385 (9th Cir. 1994). Thus, I conclude that regardless of which state law is initially referenced and relied on, the result in the end must be compatible with ERISA ends and serve, not undermine, it purposes. Resolution Trust Corp. v. Financial Insts.Retirement Fund, 71 F.3d 1553, 1556 (10th Cir. 1995); Member Services Life Insurance Company v. Amer.National Bank and Trust Co. of Sapulpa, 130 F.2d 950, 956 (10th Cir. 1997).

Were employee benefit plans to be differently interpreted and enforced from one state to

7

another regardless of the sameness of the plan, the size or identity of the employer, the interests requiring protection or the potential of trauma to both local and national economies, the unpredictable and varying results could be nothing less than unjust and tumultuous. Most certainly, those public interests which ERISA seeks to protect would be harmed. At the same time, American jurisprudence has always included public policy in the interpretation and enforcement of contracts. G. Richard Shell, "Contracts in the Modern Supreme Court," 81 Calif. L. Rev. 433 (1993). And in so doing, offense to constitutional and statutory policies have been among the first considerations. Id. at 441. "Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." Id. at 491, quoting Chicago B & Q.R.R. v. McGuire, 219 U.S. 549, 567 (1911). Public policy as expressed by federal statute therefore provides the focus for the outcome of this case and the most compelling answers to the issues presented. See: Seymour v. Blue Cross-Blue Shield, 988 F.2d 1020, 1023 (10th Cir. 1993).

### New Mexico Law

I have applied New Mexico, rather than California law for three reasons. First, I find no agreement of the contracting parties which forecloses the application of New Mexico law. Even though both insurers claim that as a part of their contracts the parties agreed California law would apply to construction, interpretation and enforcement, I do not find such an agreement. While the insurers point to written statements preceding their policies which state simply that the policy is to be interpreted under California law, the referenced statement is signed in each case only by a representative of the insurer and not by a representative of Defendant Parnelli. In addition, nothing in either policy references or incorporates the referenced statement as part of

8

the contract with Defendant. Thus, I find only a unilateral statement of the insurer.

> There is sharp conflict of authority as to whether the parties can,
> by mutual agreement, specify what law shall control the construc-
> tion and enforcement of the contract. It is apparent that there is no
> such mutual agreement in any case--that what really is present is a
> stipulation inserted by the insurer in the application or the policy
> that the law of a certain jurisdiction will control. Usually the in-
> sured knows nothing of its existence, and probably would not un-
> derstand its significance if he did. Appleman, Insurance Law and
> Practice, sec. 7074.

Secondly, I have applied New Mexico law because this case involves not only issues of

federal policy, but also matters of significant state interest. In such circumstances New Mexico

courts apply New Mexico law. Estate of Gilmore v. Gilmore, 124 N.M.119, 946 P.2d 1130

(Ct.App. 1997). In addition, New Mexico's public policy priorities are consistent with the

congressional concerns underlying ERISA. In a case involving an excess loss policy, for

example, the New Mexico Supreme Court required an excess loss insurer to cover the Plaintiff's

losses, even though an initial underlying payment of $6,000,000 was not made. Rummel v.

Lexington Insurance Company, supra. In support of its holding, the New Mexico Supreme Court

cited public policy, expressing a need to protect the rights and expectations of beneficiaries,

prevent a clearly unjust result and preclude a windfall to insurers. Id. These concerns express a

state public policy which is wholly compatible with ERISA ends and support application of New

Mexico law to the present case.

New Mexico is considered a "traditional" state where choice of law issues are concerned

and the traditional approach when contract issues are involved ordinarily refers to the law of the

place where the contract was made. Yet, New Mexico makes exceptions for public policy. Estate

of Gilmore v. Gilmore, supra. "New Mexico courts have not necessarily mechanically applied the

9

lex loci contractus rule." State Farm Mutual Insurance Company v. Conyers, 109 N.M. 243, 247, 784 P.2d 986, 990 (1989). Where compelling circumstances are found, New Mexico has departed from the traditional "place of injury" and "place of contract" rules and as the forum state has applied its own law. Symeonides, S.C. "Choice of Law in the American Courts in 1998: Twelfth Annual Survey," 1999 Amer. J. Comp. Law, 327, 340.

In matters involving public policy New Mexico has considered the Restatement (Second) of Conflict of Laws "significant relationship test" or has formulated its own rule. By the former standard, the law applied is the law of the state containing "the principal location of the insured risk during the term of the policy." State Farm Mutual Insurance Company v. Conyers, supra at 109 N.M. 246, 784 P.2d 991. With the latter, New Mexico tends to focus on governmental interests and a particular substantive policy. In either event, New Mexico no longer applies traditional choice of law rules if such application would violate public policy. Shope v. State Farm Insurance Company, 22 N.M. 398, 399, 925 P.2d 515, 516 (1996); Estate of Gilmore v. Gilmore, supra; Torres v. State, 119 N.M. 609, 613, 894 P.2d 386 (1995). It appears, then, that New Mexico is moving away from a single factor test. Considerations which cause New Mexico courts to reject the lex loci contractus rule include "concern for fundamental principles of justice" and "the expectations of the insured." Shope v. State Farm Insurance Company, supra at 122 N.M. 400, 925 P.2d 516.

Although New Mexico has not regularly applied a forum rule nor expressly adopted the position of the Restatement (Second) of Conflicts, recent cases at both trial and appellate levels demonstrate that New Mexico courts have applied and clearly not rejected alternative choice of law methodology which incorporates a broader range of data than the restricted traditional

10

approach. Amer. J. Comp.L., supra.; Horn,"The Choice-of-Law Revolution: A Critique," Col. L. Rev. (May, 1983) 772, 779. "New Mexico's highest court has recently acknowledged its past adherence to the lex loci delicti rule but did not apply it." Amer. J. Comp.Law, supra.; Torres v. State, supra. "In contract conflicts, the New Mexico Supreme Court did at one point ponder whether to abandon the lex loci contractus rule, but has recently applied it without discussion." Amer.J. Comp.L., supra at 340-341; Reagan v. McGee Drilling Corp., 123 N.M. 68, 933 P.2d 867 (Ct.App. 1997), cert. denied 122 N.M. 808, 932 P.2d 498 (1997); State Farm Mutual Insurance Company v. Conyers, supra. All of this leads me to conclude that in the case at hand New Mexico would apply New Mexico law.

The third reason I apply New Mexico law in this case is because New Mexico, and not California, has an interest in the outcome. This was the deciding factor in the choice of law applied in State Farm Mutual Insurance Co. v. Conyers, supra. "New Mexico was the principal location of the insured risk." Id. Most states currently apply their own law where the interests of the forum state predominate; " . . . if the forum has had any significant connection with the matter, it may choose to enforce its rules as being better law than that of another place." Appleman, supra at sec. 7071.

California's interest in this controversy stops at approval of the forms utilized. In comparison, Plaintiffs are New Mexico resident and New Mexico's relationship involves important and on-going contacts with both the parties and underlying events. Plaintiff Jim Cain was an employee in New Mexico at the time health benefits were denied and both the breach of contract and the breach of fiduciary duty at the heart of the case occurred in New Mexico. The dire

consequences of enormous medical bills left unpaid at the fault of the Defendant fell on Plaintiffs while in New Mexico. The case began when Presbyterian Health Care Services, a local health care provider, brought an action in state court to recover payment for medical treatment provided in New Mexico, and both before and after Plaintiffs' hardships and bankruptcy, Plaintiffs received New Mexico services. In real terms, New Mexico has supported the full burden that underlies this litigation and has a continuing interest in its outcome.

I conclude that application of New Mexico law in this case is the better choice and that such choice acts to provide substantive justice. Accordingly, where my conclusions in this case are not directed by ERISA and the public policy underlying its express provisions, I have referred to New Mexico law.

The Garnishees' Position

The central issue as framed by the parties is whether the Garnishees hold property belonging to the Defendant or, in other words, whether either or both of the Garnishees owe a debt to the Defendant or have property in their possession which might properly belong to or be claimed by Defendant. If the Garnishees hold property subject to claim of the Defendant, garnishment is a proper means of proceeding to collect Plaintiffs' judgment. Farmers Ins. Exchange v. Ledesma, 214 F.2d 495 (10th Cir. 1954); Barela v. Lopez, 76 N.M. 632, 417 P.2d 441 (1966).

The present controversy, however, does not represent the usual garnishment action in which the garnishee is an impartial and innocent third party with no connection to the dispute between judgment debtor and garnishor. See: Central Security & Alarm Company, 125 N.M. 438, 963 P.2d 515 (Ct. App. 1998), *cert. denied* 125 N.M. 322, 961 P.2d 167 (1998). What the

12

Garnishees struggle to protect in this case is their own interest.

Both insurers might have been joined as parties. It appears neither were named because both agreed with Defendant to the contrary. Both insurers, however, were potentially liable for part of the judgment from the beginning. While they participated with a reservation of their rights to defend against coverage, there was not at any point an issue of coverage. If Defendant were found liable for more than $60,000 in covered health benefits and Plaintiffs collected that amount from Defendant, the insurers clearly would be required to pay the balance. The sole reason the insurers are resisting payment now is what has been taken by them as a fortuitous turn of events. An insolvent Defendant never paid the underlying $60,000 and a defunct corporation will never do so.

The Garnishees' positions and their cross-motions misplace the essence of the dispute. The Motion for Summary Judgment filed by Garnishee John Alden Life Insurance Company supports its argument that it does not hold property belonging to Defendant by contending that (a) the policy at issue is a reimbursement policy with coverage triggered only by Defendant's payment of $60,000 in medical expenses, which has not occurred, and (b) the policy at issue does not cover the medical expenses for which Plaintiff was awarded judgment. The USBenefits' Motion for Summary Judgment contends that (a) USBenefits was not a party to Plaintiff's action, had no judgment entered against it and cannot now be made Defendant's liability insurer, (b) there exists no contract of insurance or other fiduciary relationship between Plaintiffs and USBenefits and Plaintiffs can have no greater rights to coverage than Defendant, and (c) the USBenefits policy is solely an excess reimbursement policy that does not include a contractual obligation to pay Plaintiffs directly or to satisfy the judgment in this case. USBenefits states in its

13

Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment: "As the factual record makes clear, USBenefits' Policy is only an excess reimbursement policy. It is not a general liability policy designed to cover losses which Parnelli has sustained in the administration of its health plan. . . . " Id. at p. 11.

Only some of these arguments are pertinent because the judgment unquestionably represents what would have been paid under the two policies of insurance had Parnelli not balked on the "covered person" issue. At the time Parnelli Jones refused to pay Angel Marie's medical expenses only one issue existed. Was Angel Marie Cain a "covered" person under Parnelli's employee benefits plan? Once it was held that Angel Marie should have been included in Parnelli's employee health benefits, there was no other question. Her medical expenses were to be paid by Parnelli. Likewise, by virtue of the insurance purchased to support Parnelli health benefits, all of Angel Marie's expenses in excess of $60,000 were to be covered, as well.

Even though each insurer participated in the underlying lawsuit with the express reservation of a right to defend against coverage at a later time, from the earliest stages of the case it was clear that (a) the amount owing for Plaintiffs' medical expense claim exceeded $60,0000, and (b) if Parnelli were found liable on the claim, so too would the excess coverage insurers be liable. There was not at any time an issue whether the amount, if held to be due from Parnelli, would not fall within the insurance coverage. In this respect as against Parnelli, there were no defenses for the insurers to reserve. Once Parnelli became liable for $60,000 of Plaintiffs' medical expenses--and paid it--the insurers would be liable for the balance without any question of coverage remaining. Depending on the outcome of Plaintiffs' lawsuit, either both Defendant and its insurers would be liable or neither.

14

As to claims not submitted by Parnelli and proof of loss not filed with the insurers, participation of the insurers in this litigation from its earliest point satisfies all the same needs. Active involvement in settlement negotiations and the decision to defend by going forward with a trial on the merits, asking for neither a claim to be submitted or a proof of loss to be filed, leaves both at this point meaningless requirements. If this is why payment was withheld, the insurers could have said so a year ago. Certainly, both must understand that no court is likely to construe a policy of insurance so as to deny coverage on either of these grounds, and at this point to take a position of no liability based solely on these requirements is unconscionable. If this were permitted, the existence of the policies, the protections intended by ERISA, and the intention of the parties at the time all would be rendered non-existent.

More importantly, nothing in the record leaves either insurer with a reasonable basis to argue that the judgment represents more than the cost of covered health benefits or includes amounts for a wrongful act or an administrative expense. Nothing indicates that the damages awarded were based on a "general liability" loss or administrative expenses. It also does not matter that the insurers took no part in denying health benefits to the Plaintiffs because none of the judgment compensates for the denial per se. Certainly, the damages awarded do not include monetary compensation to remedy breach of a fiduciary duty. The breach of fiduciary duty as held by the Memorandum of Decision is found in Parnelli's failure to inform Plaintiff Jim Cain how to include his new child in his health benefit plan, and by any reading of the decision, the remedy for Parnelli's breach is not money damages. It is inclusion of Angel Marie Cain in Parnelli's health benefit plan from her birth date and payment of Angel Marie's medical expenses accordingly. The judgment therefore represents only what should have been paid as

15

medical expenses at the time incurred and interest following non-payment. The initial refusal to pay medical benefits for Angel Marie Cain only changed when payment under the policies might be due. It adds to the total amount only because interest has accumulated on what should have been paid, but since the two insurers have had a continuing opportunity of several years time to stop the running of interest, neither is in a position at this point to complain that interest unfairly enlarges the amount to be covered.

All other arguments can essentially be set aside, then, and the basic position of the Garnishee-insurers can be reduced to a single point: no payments are due under either insurance policy until Parnelli has actually paid in excess of sixty thousand dollars on an employee health benefits claim and because Parnelli has not paid on Plaintiffs' claim, the insurers need pay nothing under either policy. Reasoning that Defendant Parnelli is entitled to nothing under either insurance policy, the insurers insist the proceeds of the policies are not accessible by writs of garnishment to satisfy a judgment against Parnelli.

This argument, on its face very simple, attempts to transform what has not at any point been the customary or usual garnishment action into customary terms and in the process transmute the true nature of what is occurring. By the insurers' thinking, they are free to use Parnelli's demise as their sudden good luck, and in spite of the purchase of the insurance policies to provide something for Parnelli employees they would not otherwise have had, leave Plaintiffs to suffer the loss. This has never been the approach to construing insurance coverage sanctioned by the courts. It certainly constitutes the antitheseis of ERISA policy and design.

At least at first blush, it would appear that the reimbursement aspects of the insurance policies were to eliminate the possibility of collusion between the insured and its employees or

health care providers and to maximize the insurers' confidence that only real, necessary, covered and fairly priced medical expenses were paid for under the policy. I hesitate to view the policies' reimbursement provisions as purely the insurers' means or hope of escape. Yet, if I accept the Garnishees' position, I must accept that by the terms of the policies, the form of the claim and the payment scheme called for (for whatever reason so constructed), can hold a clear potential to destroy completely the purpose and substance of the coverage. New Mexico courts have looked at analogous provisions and rejected them. In one case the New Mexico Supreme Court referred to the "repugnancy" of irreconcilable language. Allstate Insurance Co. v. Stone, 116 N.M. 464, 467, 863 P.2d 1085, 1088 (1993). "When 'an exclusionary clause simply nullifies the grant' of coverage, this Court will 'refuse to apply the clause that deprives the insured of the insurance coverage which the insured reasonably understood was afforded by the policy.'" Id., quoting Federal Insurance Co. v. Century Federal Savings and Loan Ass'n, 113 N.M. 162, 169, 824 P.2d 302, 309 (1992). In the same way, refusal to apply the payment scheme in the present case is justified when it defeats the reason the insurance policy exists in the first place.

If I reject the Garnishees' position, neither insurer is forced to cover anything other than what Defendant Parnelli and the insurers expected to the policies cover at their inception. Therefore, I see requiring payment as the only interpretation and construction of the contract that is conscionable. The two policies exist solely because Parnelli as an employer determined to provide his employees with health benefits in excess of $60,000 per incident and in compliance with ERISA to provide some assurance that funding of the additional health benefit was reasonably secure and reasonably promised. To allow non-essential mechanisms for payment to

17

nullify that purpose makes little sense and does nothing to promote reliance on the provision and availability of employee benefits.

## ERISA

ERISA embodies a comprehensive scheme "intended in significant part to ensure" that employee benefits will actually be received by plan participants and beneficiaries. Guidry v. Sheet Metal Workers International Assoc., Local No. 9, 10 F.3d 700, 711 (10th Cir. 1993), relying on Nachmann Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 361 (1980). And federal courts have "consistently protected this purpose" by vigorous enforcement. Guidry v. Sheet Metal Workers, supra. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Allowing insurers in the present circumstances to avoid all responsibility for Plaintiffs' judgment and leave the totality of the loss for the failure of Parnelli's employee benefits plan to Plaintiffs completely contradicts these purposes.

Both insurers undoubtedly understood the polices at issue to be components of an employee benefits plan. Both policies explicitly refer to ERISA and to Parnelli's plan as bound by ERISA requirements. Carefullly denying any fiduciary status or obligations pursuant to ERISA, both policies demonstrate that but for their existence, Parnelli's ERISA plan was unlikely to be fully funded or able to cover expenses which might reasonably be incurred by Parnelli employees and their family members. The "fundamental purpose" of the insurance policies as Plaintiffs state is and now rely is thus impossible to deny, regardless of the technicalities of the payment delivery system or the attempts of the insurer to limit its exposure.

18

The issues insofar as the wording of the polices is concerned center on whether the delivery system or the sequence of payments should supersede the purpose of the policies.

On the one hand, Parnelli insured itself, and more specifically, its health benefits plan against claims that exceeded $60,000. On the other hand, Parnelli guaranteed its employees health benefits that would cover medical expenses in excess of $60,000. Parnelli could have elected to offer its employees health benefits with a $60,000 per person per calendar year limit. If it had so chosen, Parnelli would not have needed or purchased either policy at issue. Regardless of the provisions for payment, then, the dual purposes for purchasing the coverage must go hand in hand; and despite later unfortunate circumstances, the purposes do not operate or make sense on independent grounds. Neither do they need to. Obviously, with Parnelli Jones defunct, the first reason for purchase of the insurance policies no longer exists. The second, however, remains and an equitable and sensible construction of the contracts between the insurers and Parnelli can fulfill this purposes without unfairly harming either insurer. If the insurers are made to pay for employee medical expenses only as these exceed $60,000, both pay only what they and Parnelli intended and expected to cover. Additional amounts for interest, court costs and attorneys' fees result directly from the insurers' choice to resist payment.

### Third Party Beneficiaries

New Mexico law allows Plaintiffs to claim third party beneficiary status under the contract of insurance between Parnelli and Garnishees if the parties to the contract intended to benefit Plaintiffs, either individually or as member of a class of beneficiaries. Hoge v. Farmers Market and Supply Company of Las Cruces, 61 N.M. 138, 143, 296 P.2d 476, 479 (1956); McKinney v. Davis, 84 N.M. 352, 353, 503 P.2d 332, 333 (1972). Plaintiffs claim third party

19

status as an added ground for recovery of their judgment from the insurance policies at issue. I

find the argument supported not only in federal policy, but in New Mexico law.

> It is clear that the law today has moved drastically away from
> the strict limitations of privity of contract which the respondents
> would impose in this case. The law has expanded on many
> fronts to the point where third-parties who have made no formal
> contractual obligation with either the promisor or promisee to a
> contract are nonetheless capable of asserting standing as bene-
> ficiaries to the contract. Russell v. Protective Insurance Com-
> pany, 107 N.M. 9, 12, 751 P.2d 693, 696 (1988).

When deciding whether or not a third party beneficiary was intended under a contract,

New Mexico case law repeatedly cites 4 Corbin on Contracts, sec. 776:

> A third party who is not a promisee and who gave no consideration
> has an enforceable right by reason of a contract made by two others
> (1) if he is a creditor of the promisee or of some other person and the
> contract calls for a performance by the promisor in satifaction of the
> obligation; or (2) if the promised performance will be of pecuniary
> benefit to him and the contract is so expressed as to give the promisor
> reason to know that such benefit is contemplated by the promisee
> as one of the motivating caused of his making the contract. A third
> party may be included within both of these provisions at once, but
> need not be. Id. at pp. 18-19.

"The paramount indicator of third party beneficiary status is a showing that the parties to

the contract intended to benefit the third party, either individually or as a member of a class of

beneficiaries." Valdez v. Cillessen & Son, Inc., 105 N.M. 575, 580, 734 P.2d 1258, 1263 (1987);

Hoge v. Farmers Market & Supply Company of Las Cruces, supra. "Intent to benefit a third party

must appear either from the contract of from other evidence that the person claiming to be the

beneficiary is an intended beneficiary." Jaramillo v. Providence Washington Insurance Company,

supra at 117 N.M. 343, 871 P.2d 1349. "Absent any ambiguity, the provision of the contract need

only be applied." Id.

In the present case, I find ambiguity. When the point of the insurance policies or the reason for their existence is placed face to face with the payment process utilized, the intent of the parties can be either protection of Parnelli from insolvency or provision of additional health benefits for Parnelli employees, or more likely, both. By the terms of the policy (in addition to the employees' contracts, the employer's handbook and several other indications apart from the insurance policies) Parnelli's expectation was more than its own protection from catastrophic claims, it was also that Parnelli employees would have coverage for medical expenses in excess of $60,000. "In general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." Saltarelli v. Bob Baker Groups Medical Trust, supra at 386.

In the circumstances of this case, dual expectations were obviously present. Both are obviously reasonable. It would serve no purpose to take evidence as to which expectation is the more reasonable or which expectation might be given priority. Neither can be disputed from the plain facts, including the language of the policies at issue and the conclusions of the Memorandum of Decision which awarded Plaintiffs judgment. The question is whether one can foreclose the other.

A similar situation faced the New Mexico Supreme Court in Rummel v. Lexington Insurance Company, supra. In Rummel, Plaintiff obtained a judgment against Circle K Corporation in a personal injury case. Circle K filed a petition for reorganization in U.S. Bankruptcy Court, but several insurance policies were potentially liable for the judgment, and Circle K requested they pay it, settle the case or pursue an appeal. Only one insurer complied with the

request and subsequently reached a settlement agreement with the Plaintiff. Rummel, on behalf

of Circle K, then sued Lexington Insurance Company to force it as an excess insurer to pay part

of the judgment. Together with other arguments, Lexington responded with the same argument

as insurers in the present case--that its excess coverage policy could not be reached unless an

underlying amount had actually been paid first, and no such amount had been paid.

The New Mexico Supreme Court undertook construction of the insurance contract to

determine whether this was a fair resolution of its terms. In construing the contract the Court

stated:

> Ambiguities arise when separate sections of a policy appear to
> conflict with one another, when the language of a provision is
> susceptible to more than one meaning, when the structure of the
> contract is illogical, or when a particular matter of coverage is
> not explicitly addressed by the policy. See 2 Couch 3d . . . sec.
> 21:14; . . . . The resolution of ambiguities becomes a matter for
> the court and is often described as a matter of law rather than a
> factual determination. See 2 Couch 3d . . . sec. 21:13
> . . . .
> In determining the existence of an ambiguity, the language at issue
> should be considered not from the viewpoint of a lawyer, or a
> person with training in the insurance field, but from the stand-
> point of a reasonably intelligent layman, viewing the matter fairly
> and reasonably, in accordance with the usual and natural meaning
> of the words, and in the light of existing circumstances, prior to and
> contemporaneous with the making of the policy. 2 Couch 3d, supra,
> sec. 21:14. . . . . The insurance contract . . . will be construed as a
> whole. Id. at 123 N.M.757-758, 945 P.2d 975-976.

As in the present case, then, the bulk of the insurer's argument in Rummel rested on the

fact of the insured's bankruptcy. The New Mexico Supreme Court responded by finding

ambiguity in application of policy terms and by resolving that ambiguity by reference to the

interests of the insured and public policy. Apart from any specific or precise language in the

contract, the Court found Circle K's non-payment of an underlying amount no reason to excuse the insurer's payment under the policy.

> It is the debtor in need of financial relief who receives the protections granted by the bankruptcy process. Such benefits were never intended to absolve third parties of debts they share in common with the debtor. . . . To conclude otherwise would betow a windfall upon insurers. . . . It seems clear that it is the policy of the law to discharge the bankrupt but not to release from liability those who are liable with him." Rummel v. Lexington Insurance Company, supra at 123 N.M. 762, 945 P.2d 980.

I find the same reasoning appropriate to the present case. Ambiguity can be found in the case at hand, as in Rummel, in the failure of either policy to address what circumstances might be equivalent to Parnelli's payment of $60,000 (such as a judgment) in order to preserve coverage under the policy in the event of extreme situations. Ambiguity can also be found in the policies' acceptance of ERISA as a controlling statutory scheme for protecting promised employee benefits and explicit acknowledgment of the insurance coverage as a part of a ERISA plan, without providing for what happens to an employee claim for medical expenses covered by the policy, if the policy itself remains the only asset of the employee benefits plan. Additionally, under differing views of the contract's application, as the parties' have argued, it is possible that the mechanisms for the policies' efficient operation could illogically cancel out the reason for the policies' existence in the first place.

If not the words of the policies, the words compared to their context are inconsistent. Where the policy was purchased in order to provide health benefits for employees in excess of $60,000 per claim, and where the amount to be paid unquestionably represents the amount due for covered health benefits, I see no reason why any single term of the policy should preclude or

23

forgive payment. So long as the insurers are not made to pay the original $60,000 due from Parnelli, they are made to cover only what they contracted to cover and pay only what they should have anticipated. As the New Mexico Supreme Court pointed out in <u>Rummel</u>, "the excess insurer has no rational interest" in seeing the underlying amount actually paid in full, "as long as it is only required to pay the loss for which it would otherwise have been liable under the terms of the contract." <u>Id</u>. at 123 N.M. 763, 945 P.2d 981.

To interpret the policy any other way supports insurers in an effort to write policies that will encompass every potential for avoiding payment. It also would place all risk associated with the benefits of a ERISA plan and all losses on the employees. If this were what Parnelli or ERISA envisioned, there need not have been a policy of insurance in the first place. Considering that the insurers accepted the premiums and issued policies knowing the purpose of the insurance, leaving Parnelli's employees with the whole of the loss comes dangerously near an unconscionable opportunism that neither public policy nor a court can condone.

Therefore, in addition to public policy reasons for allowing garnishment in this case, interpretation and construction of the contract supports a conclusion that Plaintiffs are third-party beneficiaries of the policies at issue and that Defendant, its employees, and its employee benefits plan have an interest remaining in the policies as if the policies were a sole existing asset of the plan. For all the same reasons as articulated by the New Mexico Supreme Court in <u>Rummel v. Lexington Insurance Company</u>, coverage must be available to Plaintiffs despite failure of the underlying payment.

### Propriety of Garnishment

The Garnishees argue that Plaintiff can take by way of garnishment no more than what

belongs to Defendant Parnelli. What belongs to Parnelli is the financial support it purchased in order to provide its employees a sound and sufficient employee benefits plan. What belongs to Parnelli and to more than Parnelli is fulfillment of the substance of the insurance, coverage for covered medical expenses in excess of $60,000. Viewing the insurers' as "innocent" Garnishees and unrelated, they hold and now must give up no more than what Defendant Parnelli purchased. Neither pays more than what would have been paid absent Parnelli's demise.

As I understand it from the record, USBenefits is to pay 79 percent of the judgment due, minus $30,000 (half of the underlying amount that would have been paid had Parnelli survived) and John Alden is to pay 21 percent of the judgment due, minus $30,000. In addition, both are to pay interest in the same pro rata shares, for the time periods and at the rate determined by the trial court, and both are to pay the same pro rata share of the court costs and attorney's fees awarded by the trial court. I acknowledge both insurers' arguments that court costs and attorney's fees do not come within the terms of the policies, but I find by the circumstances of this case, that the insurers payment of Plaintiffs' attorneys' fees is permitted by ERISA and is otherwise just and appropriate.

### Costs, Interest and Attorney's Fees

Both Garnishees argue strenuously that the terms of the insurance policies at issue do not include administrative expenses of Defendant Parnelli's employee benefit plan, litigation costs or Plaintiffs' attorney's fees. Both cite the limitations in their policies and stand on their statement of a reservation of the rights to defend under the terms of the policies. I find, however, that the insurers went further than they needed to go in order to assuage Defendant's demands and protect their interests under the policies. This is especially evident in the insurers decision to go forward

25

with a trial on the merits after Defendant made it clear it had no interest in defending the case.

Several documents included as exhibits to Plaintiff's Motion for Summary Judgment (and not disputed by the Garnishees) evidence the Garnishees taking controlling of this case and stepping into the shoes of the Defendant. Plaintiffs' Exhibit 9, a USBenefits office memorandum dated December 2, 1997, states: "Parnelli Jones is in the process of selling all of its assets and possibly liquidating before the end of the year due to financial difficulties. Parnelli Jones would only contribute $5,000 towards settlement and legal fees/costs associated with this case." A hand-written notation on this document reads: "2. We could fund the final split with John Alden." Exhibit 14, a USBenefits office memorandum dated March 29, 1999, contemplates the two insurers covering the full judgment, less Defendant's $60,000 deductible, but without the requirement that Defendant make any payment. USBenefits Response to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment states at page 8: "USBenefits and John Alden agreed with Parnelli that they would pay the fees for the upcoming trial in order to see if the issues could be resolved on the merits. The only other choice was to let a default judgment be entered and face the certain threat of an unwarranted attempt to collect from USBenefits' Policy."

The Garnishees' exhibits make it clear that, first, the two insurers made an independent choice to proceed to trial which was not compelled by the terms of either policy, and secondly, the two insurers made the decision solely in their own interest without consideration for (or in spite of) Defendant's position. According to Exhibit 19 of USBenefit's Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment:

> . . . . Parnelli commenced a voluntary liquidation about

26

> the time of the last court-ordered settlement conference
> in the fall of 1997. . . . all of Parnelli's assets have been
> distributed to secured creditors. . . . after the distribution
> of assets, Parnelli's creditors still had unsatisfied claims
> in excess of $12 million, which have now been reduced
> to judgments with earlier priority dates than the recently
> entered judgment in the above-referenced lawsuit.

An affidavit by Barbara Fox Stoner, an attorney and officer of USBenefits employed by

its parent company ("the person initially responsible for handling USBenefits' involvement in the

dispute between RPJ Tire Company d/b/a Parnelli Jones" and Plaintiffs) states:

> At the end of 1997, USBenefits learned from Parnelli
> that it was bankrupt and was going to liquidate. Trial
> of the case between Plaintiffs and Parnelli was set for
> January, 1998. Parnelli informed USBenefits that it
> was abandoning the case, intended to default at the
> trial, and let a judgment be entered against it. . . .
> USBenefits and John Alden Insurance agreed with
> Parnelli that they would pay the fees for the trial
> in order to see if the issues could be resolved on the
> merits. The only other choice was to let a default judg-
> ment be entered and face the certain threat of an unwar-
> ranted attempt to collect it against Continental.
> USBenefits' Response to Plaintiffs' Motion for Sum-
> mary Judgment and Cross Motion for Summary Judg-
> ment, accompanying affidavit at p. 5.

The decision to proceed to trial after the Defendant intended to default and liquidate its

assets was made by the insurers as a business option and not as a policy mandate. Both insurers

elected to proceed when they were not compelled to do so. They made their own agreement with

Parnelli's counsel regarding attorney's fees for trial and they proceeded for their own reasons, by

their own unfettered decision, in Defendant's name.

Repeatedly stating a reservation of the right to defend does not permit actions by the

insurers which are as far to the contrary as possible. At some point it must be said that what an

insurer does overrides what the insurer says. The present case appears to be an excellent example of this contradiction. As in Pendleton v. Pan American Fire and Casualty Company, 317 F.2d 96 (10th Cir. 1963), the insurers in this case "assumed the defense of the state court suits and completely controlled and directed such defense up to the event of settlement. . . ." Id. at 98. The insurers in this case expressed the reservation of rights that the insurer in the Pendleton case did not, but having said the words, the insurers acted freely only in the opposite direction. As in Pendleton, the insurers in this case had no obligation to defend, but assumed that obligation-- beyond what the insured demanded of them and beyond what was reasonably consistent with a reservation of rights. There may be no limits on such an approach, but if insurers decide independently to prolong litigation solely in their own interest, they risk the fair and easily anticipated consequences of their decision.

Both insurers elected to take the case to trial when the insured had no interest in doing so. Both insurers embraced an unnecessary risk and lost. Even though proceeding through trial was not their only alternative, both insurers decided to take on substantially increased costs and attorneys' fees and to force the case forward when the Defendant, standing alone, had absolutely nothing to gain. The insurers created and accepted added liability, completely apart from the Defendant's demands or the terms of the insurance. Whether or not by provisions of the policy the insurers would have been responsible for litigation costs, the insurers made themselves responsible by taking the case into their own hands and proceeding with it to a ruling on the merits when Defendant had no reason or intention to do so.

Now the Garnishees repudiate all liability for the costs of trial and loss on the merits to the Plaintiffs. Both insurers disassociate themselves from any obligation. Yet, I see no fairness or

28

or justice in allowing the insurers to have it both ways. Their approach to the case was their own choice and the price of that choice should be theirs, as well. It is too late to retreat to the express terms of its policy as a private shelter. Again, the insurers would leave the whole of the loss in the hands of the Plaintiffs. Whether the insurers continued this litigation in their own name or moved ahead, as they did, in the name of a defunct and uninterested Defendant, the decision, the risk and the consequences are the same. Were the insurers now to pay precisely what they would have paid prior to trial on the merits allows no incentive whatsoever for them to avoid entanglements like the present one in the future.

The decision to take the case to trial was clearly a separate and independent decision of the two insurers with only their own interests in mind. This decision appears to have been an extraordinary one. Exhibit 2 of USBenefits' Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment states: "Please be advised that it is not The Continental Insurance Company's general practice to become involved in the resolution of a dispute between an Employee and his or her Employer or the Plan. Accordingly, at the present time, The Continental does not intend to intervene or otherwise participate in the defense of the above referenced claim."

By the terms of the garnishments, Plaintiffs are entitled to whatever Defendant may have be entitled, and surely Defendant is entitled to the costs and fees incurred by an independent decision of the insurers acting under cover of Defendant's name. This liability for court costs and attorney's fees is not grounded in the express terms of the two policies, but is a consequence of the independent business decision that resulted in the greater part of the fees and costs at issue.

29

Plaintiff's cite ERISA as additional reason to collect attorney's fees and costs from the present respondents. Plaintiffs argue, first, that as beneficiaries of a ERISA employee benefit plan, Plaintiffs held reasonable expectation of an award of attorney's fees in its effort to enforce provisions of ERISA and the benefit plan, and secondly, that the present Garnishees, both aware of ERISA provisions for an award of attorney's fees and costs, should be held accountable for that understanding and their actions taken. I agree.

ERISA provides at 29 U.S.C. sec. 1132(g) that in actions to enforce by a participant, beneficiary or fiduciary of an employee benefit plan, a district court has discretion to award reasonable attorney's fee and costs to either party. The failure to offer payment of that part of Plaintiff's judgment which represented covered medical expenses in excess of $60,000, without regard for Parnelli's insolvency and non-payment under the terms of the policy, totally ignores the insurers' responsibilities when issuing a policy both insurers understood to be part of a ERISA plan and purchased solely to provide employees with more employee benefits than the employer could have otherwise provided. Neither insurer need be a fiduciary to have taken a higher road. Both insurers accepted premiums to cover employee medical expense claims, but afterward, instead of rendering payment to Plaintiffs for medical expense claims as these exceeded $60,000, both insurers took advantage of Parnelli's misfortunes and exascerbated the Plaintiffs' in extended efforts to avoid their obligation.

I therefore have determined that in the interests of justice and ERISA policy enforcement the insurers should be accountable for costs and attorney's fees to date. Rather than re-litigate the issue of Plaintiffs' proper hourly rate, additional fees should be calculated at the same rate allowed by the trial court. In addition, the aid of a second counsel on Plaintiffs' behalf for

30

the post-trial matters has been exceedingly helpful and considering the number of counsel who

have appeared on behalf of the Garnishees, I see no problem with fees for Plaintiffs' second

counsel at a rate which corresponds with what has been allowed by the trial court. If the amount

of hours claimed by the two Plaintiffs' counsel for the post-trial matters cannot be resolved

among the attorneys of record by formal agreement and an agreed form of order provided, the

number of hours to be paid by the insurers for post-trial matters will be addressed by court

order and hearing, if necessary. No additional arguments or documents are to be filed. If counsel

do not reach an agreement within thirty days of this Memorandum Opinion and Order, I will

proceed with a determination.

Motion to Strike Plaintiff's Exhibits

Garnishee John Alden Life Insurance Company moves to strike the affidavits of Doug

Wilson and Plaintiff Jim Cain which were filed with Plaintiffs' Response to Garnishees' Motions

for Summary Judgment. Under the heading of Motion to Strike Affidavits, Garnishee USBenefits

files the same motion. Garnishee Alden argues that Plaintiff Jim Cain's statement lacks founda-

tion and is irrelevant, and further, that the statement is not based on personal knowledge of the

Alden policy, but on a partial quote from a Parnelli benefits book and from hearsay.

Garnishee USBenefits calls both affidavits "rank hearsay" because they refer to

statements of "insurance company" employees from California (one named "Rufinelli" and

possibly another unidentified) purportedly telling Plaintiff Jim Cain and Parnelli employee Doug

Wilson that the "insurance company" would pay for medical bills which remained after Parnelli

had paid initial amounts. USBenefits argues, in addition to hearsay, that the stated expectations

of the affiants are baseless and unreasonable because they should have expected no more than

31

what is stated in the plain language of the contract and the contract clearly limits the policy to reimbursement.

I disagree on all points and deny the motions to strike. I accept Plaintiff's affidavit as a statement of Plaintiff's understanding and his state of mind at the time and find that it provides nothing extraordinary, particularly because Plaintiff's belief is already a part of the case, inherent in the Memorandum of Decision which held Parnelli (by reason of its health benefit plan) responsible for more than $60,000 of Plaintiffs' medical bills.

The Garnishees argue unnecessarily. Other evidence long in the record makes the arguments pointless. The testimony of Defendant's chief financial officer, for example, establishes that the insurance policies were to cover claims in excess of $60,000. Plaintiffs' Exhibit B to Plaintiffs' Reply in Support of Their Motion for Summary Judgment and Plaintiffs' Response to Garnishees' Motions for Summary Judgment. Other opinion is not persuasive one way or the other. The affidavits satisfy Plaintiffs' Rule 56 requirements, but otherwise are not worth the Garnishees' concern. Even if I were to strike both affidavits, nothing in the case would be seen in a different light; the facts of the case as already established and viewed by the trial court would hardly differ.

I acknowledge that the motions to strike emphasize the Garnishees' dispute of certain facts: (1) that Parnelli Jones employees, including Plaintiff Jim Cain, held a reasonable expectation that the insurance policies at issue would cover medical expenses beyond what Parnelli paid; (2) that Plaintiff Jim Cain has a right by the terms of the policy to a direct payment; and (3) that the insurance policies provided only for reimbursement after notice and proof of a loss exceeding $60,000. The third point is not disputed. The other two are settled by other means

and are insufficient as argument only to preclude entry of a summary judgment. Considering the record in this case, the motions to strike do nothing to further the case one way or the other and both are denied.

NOW, THEREFORE, IT IS ORDERED that the Garnishees' Motions for Summary Judgment are denied, and the Plaintiffs' Motion for Summary Judgment is granted;

IT IS ORDERED that the Garnishees are to pay over to Plaintiffs their appropriate share of the proceeds of Defendant's insurance policies in an amount which will satisfy the judgment, the court costs, interest and attorney's fees awarded by the trial court, minus thirty thousand dollars each;

IT IS ORDERED that the Garnishees are to pay Plaintiffs' post-trial court costs and attorneys' fees as agreed by the parties and as set out within thirty days of this Memorandum Opinion and Order by a separate order prepared by Plaintiffs' counsel; and

IT IS FURTHER ORDERED that within twenty days of this Memorandum Opinion and Order Plaintiffs' counsel is to submit (with approval of opposing counsel as to form) the necessary writs and orders for payment as here ordered (not to include court costs and attorney's fees incurred by reason of the post trial motions); and

IT IS FURTHER ORDERED that the Garnishees' Motions to Strike are denied.


_____
SENIOR UNITED STATES JUDGE

33